**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| SHANE HOPKINS, | : | |
| | : | |
| Plaintiff, | : | Civil No. 12-5134 (JBS) |
| | : | |
| v. | : | |
| | : | **OPINION** |
| JOSEPH BONDISKEY, et al., | : | |
| | : | |
| Defendants. | : | |

**APPEARANCES:**

SHANE HOPKINS, Plaintiff pro se
#111365-C
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625

**SIMANDLE,** Chief Judge

Plaintiff, Shane Hopkins, a state inmate presently confined at the New Jersey State Prison in Trenton, New Jersey at the time he submitted this Complaint for filing, seeks to bring this action in forma pauperis. Based on his affidavit of indigence, the Court will grant Plaintiff's application to proceed in forma pauperis ("IFP") pursuant to 28 U.S.C. § 1915(a) (1998) and order the Clerk of the Court to file the Complaint.

At this time, the Court must review the Complaint, pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, to determine whether it should be dismissed as frivolous or malicious, for failure to state a claim upon which relief may be granted, or because it

seeks monetary relief from a defendant who is immune from such relief.  For the reasons set forth below, the Court concludes that the Complaint should be dismissed without prejudice at this time.

## I.  BACKGROUND

Plaintiff, Shane Hopkins, filed this Complaint against the following defendants: Joseph Bondiskey, Warden/Administrator at the Atlantic County Justice Facility ("ACJF"); Correctional Officer ("CO") Scott Medio; and John Doe defendants 1-15, including Sgt. Montoya, Sgt. Swartzentruber, Sgt. Almedia, CO Rennie, CO Ivy, CO Prioli and CO McNally at the ACJF. (Complaint, Caption, ¶¶ 8, 9.)  Plaintiff alleges that the incidents at issue in this action took place while he was confined as a pretrial detainee at the ACJF.  (Compl., ¶ 7.)  The following factual allegations by Plaintiff are taken from the Complaint, and are accepted for purposes of this screening only.[1]

Plaintiff alleges that, on or about January 14, 2011, he was assaulted by Defendants, CO Medio, CO Rennie, CO Ivy and other John Doe officers.  It is unclear from the incompletely submitted Complaint what had precipitated the January 14, 2011 incident, but the allegations at pg. 12 of the Complaint appear to allege that Defendants were making derogatory comments to Plaintiff.

---

[1]  The Complaint as submitted by Plaintiff appears to be missing several pages between paragraphs 17 and 54.  These "missing" pages were filled with Plaintiff's letters regarding his administrative grievances and appeals regarding the incidents at issue in this case.

Plaintiff alleges that he did not respond to these taunts, and that he stood calmly for ten minutes while the officers restrained him with shackles, handcuffs and an attached "belly chain" on Plaintiff's waist.  (Compl., ¶¶ 53, 54.)  After Plaintiff was restrained, Defendant Rennie yanked the shackles, which pulled Plaintiff's feet and caused him to fall hard to the floor.  When Plaintiff was on the floor, he was "kicked and forcibly stepped on" by the Defendants Medio and John Doe officers.  (Compl., ¶¶ 55, 56.)  Defendants Medio, Rennie, Ivy and John Does then lifted Plaintiff's body in the air and rammed his head and face into the cell wall, "breaking the Plaintiff's front tooth and causing large lumps on the Plaintiff's scalp and forehead."  (Compl., ¶¶ 57, 58.)  A John Doe officer then pulled Plaintiff's shirt collar with such force that Plaintiff began to lose consciousness.  Plaintiff was dropped to the floor where he laid "dizzy, shaken and scared to move as these correctional officers left the cell."  (Compl., ¶¶ 59, 60.)  Plaintiff alleges that all of the Defendants, except Warden Bondiskey, personally participated in the assault or stood by and watched the attack and did nothing to stop it.  (Id., ¶ 61.)

Plaintiff alleges that he was left in his cell for a while until Sgt. Decicco came with a video camera and a nurse to look at Plaintiff's injuries.  Plaintiff further alleges that the nurse did nothing to treat his injuries, although Sgt. Decicco apparently video-recorded Plaintiff's injuries and statements

concerning the incident.  (Compl., ¶¶ 62-69.)  Plaintiff alleges
that he believes Defendant Medio told the nurse to falsify
reports concerning Plaintiff's statements and injuries.  (Compl.,
¶¶ 70, 71.)

Plaintiff next alleges that after several hours of being
shackled in the holding cell, he began to feel severe pain in his
stomach where he had been assaulted.  He repeatedly asked to use
the bathroom but was ignored.  Plaintiff lost control of his
bowels and defecated in his pants.  When Plaintiff called out for
help, the John Doe correctional officers laughed at him and
refused to allow Plaintiff to change his clothes or clean his
body from the feces until the following morning.  At that time,
Plaintiff complained to a nurse about abdominal pain and itchy
skin.  (Compl., ¶¶ 72-76.)

Plaintiff alleges that there are video tapes of the assault
incident which allegedly shows that Plaintiff did not punch
Defendant Medio in the face as charged.  On January 15, 2011,
Plaintiff had been issued several disciplinary charges concerning
the January 14, 2011 incident.  (Compl., ¶¶ 77-79, 81.)

On January 16, 2011, Plaintiff complained to a nurse about
three welts on his waist and back.  The nurse called them "boils"
and took a culture.  She also gave Plaintiff an antibiotic
medication "Cipro" for it.  Plaintiff alleges that the test
revealed that Plaintiff had a staph infection.  This staph
infection caused permanent scars on Plaintiff's back.  Plaintiff

4

alleges that it is his belief that he had contracted "Menthicillin Resistant Staphylococcus Aureus" or "MRSA" as a direct result of being held in an unsanitary cell with feces and urine for over 12 hours.  (Compl., ¶¶ 82-87.)

Plaintiff appeared before a disciplinary hearing officer on January 18, 2011.  He alleges that the disciplinary hearing officer refused to allow Plaintiff to call a witness to the January 14, 2011 incident and also refused to investigate the video tape evidence that purportedly existed, giving no explanation for not allowing the witness and alleged video evidence.  (Compl., ¶¶ 93-96.)   The hearing officer found Plaintiff guilty of the disciplinary charges based on "staffs reports and sergeants investigations," without providing the name of the investigating sergeant.  (Compl., ¶¶ 97, 98.)   Plaintiff was sanctioned with 30 days detention.  (Id., ¶ 99.)

Plaintiff appealed the hearing officer's decision on January 20, 2011.  Plaintiff alleges that he gave a sealed envelope with his appeal to the detention unit officer.  Plaintiff alleges, however, that he has not received any response to his appeal. (Compl., ¶¶ 101-103.)

Plaintiff further alleges that he filed grievances concerning the assault by defendant correctional officers, his punitive restraint, the nurse's refusal to treat Plaintiff's injuries from the assault, the denial of a bathroom that forced Plaintiff to defecate in his clothes, and the unsanitary

conditions that allegedly contributed to his staph infection. (Compl., ¶ 105.)

Internal Affairs Officer Lt. Joseph Conrad interviewed Plaintiff on January 24, 2011, pursuant to an investigation of Plaintiff's grievances.  Plaintiff told Conrad that he wanted to file criminal charges against the officers regarding the physical assault.  Plaintiff alleges, on his own "information and belief," that Conrad discussed Plaintiff's grievances and intention to file criminal charges with the very same officers who assaulted Plaintiff.  (Id., ¶¶ 107, 108.)  That very day, Plaintiff was moved from cell #5 to cell #12 in detention.  The new cell was "so cold that the Plaintiff could see his own breath when he exhaled due to the fact that all of the caulking around the window was removed, ... [and] Plaintiff was only provided with one blanket, one sheet and one prison uniform."  (Id., ¶¶ 109-111.)

Plaintiff tried to seal the window with food, such as oatmeal and mashed potatoes to keep out the cold.  On January 26, 2011, the nurse who changed Plaintiff's bandages from his staph infection noticed that Plaintiff's skin was "off color" and that Plaintiff was shivering.  The nurse took Plaintiff's temperature and told the escorting officer to give Plaintiff a t-shirt, underwear and socks.  Plaintiff further alleges that twice each day while he was in cell #12, he was told to strip naked and was subjected to a visual body cavity search, even though he had

6

never left his cell.  During these searches the officers would remove the oatmeal and mashed potatoes from the window and laugh at Plaintiff.  (Id., ¶¶ 112-116.)

On January 28, 2011, Plaintiff was escorted to the receiving department to sign criminal charges of aggravated assault filed by defendant Medio against Plaintiff.  Medio alleged that Plaintiff had struck Medio with an open hand.  (Compl., ¶ 117.) Plaintiff complained to Internal Affairs officers that the charges were retaliatory.  Sgt. Almedia was present and repeatedly told Plaintiff to "shut up" to prevent Plaintiff from explaining the situation to Internal Affairs.  Escorting Plaintiff back to his cell, Sgt. Almedia further threatened Plaintiff and allegedly said to him, "Do you really think that you can have correctional officers brought up on charges and live in this jail.  You will be labeled a snitch, there will be shit in your food, you will be found dead in your cell, just let it go."  (Id., ¶¶ 118-120.)  Plaintiff alleges that the criminal charges against him were facilitated by Conrad, who had been assigned to investigate Plaintiff's charges against Medio.  (Id., ¶¶ 121-124.)

On February 1, 2011, Plaintiff alleges that Sgt. Almedia came to Plaintiff's cell, hit the door and yelled, "This is the one writing stuff, [and] this guy dropping slips."[2]  (Compl., ¶¶

---

[2]  Plaintiff alleges that "dropping slips" means snitching on other inmates.  (Compl., ¶ 126.)

125, 126.)  Sgt. Almedia allowed other inmates to stand at Plaintiff's cell door on several occasions thereafter to threaten Plaintiff for "snitching on them."  (Id., ¶ 127.)

Plaintiff filed a grievance regarding Sgt. Almedia's threats and CO Medio's false criminal charges.  Plaintiff also sent a letter to Warden Bondiskey on February 3, 2011, reminding the Warden of his duty to protect Plaintiff from these alleged acts of retaliation.  (Compl., ¶¶ 128, 129.)

Because of the retaliation and threats, Plaintiff refused to eat food brought to him by correctional officers on the belief that the food had been tampered with.  Plaintiff further alleges that correctional officers would "violently kick the Plaintiff's cell door at all hours of the day and night and encourage other inmates to taunt and threaten the Plaintiff creating an atmosphere of fear."  (Compl., ¶¶ 130, 131.)

Plaintiff was released from detention on February 16, 2011, but still lived in fear of retaliation.  (Compl., ¶ 132.)

On April 23, 2011, Plaintiff again was interviewed by Lt. Conrad from Internal Affairs concerning Plaintiff's grievances stemming from the January 14, 2011 incident.  Plaintiff alleges that Conrad told him Defendants Medio, Swartzentruber, Montoya, Rennie, Ivy, Prioli and McNally were found to be responsible for assaulting Plaintiff on January 14, 2011.  Accordingly, Plaintiff filed criminal charges against these defendants.  (Compl., ¶¶ 133, 134.)

On May 5, 2011, Plaintiff was transferred to New Jersey State Prison.  However, Plaintiff alleges that he was frequently remanded to ACJF for court purposes and "was subjected to multiple threats and acts of retaliation."  (Compl., ¶¶ 135, 136.)  Plaintiff also alleges that he complained to Judge Bernard E. Delury about these alleged acts of retaliation during the court proceedings and asked not to be remanded to the ACJF because Plaintiff had criminal charges pending against seven ACJF correctional officers.  Despite Plaintiff's complaints, he was returned to the ACJF for court appearances.  Plaintiff was not convicted of aggravated assault against CO Medio.  The seven ACJF correctional officers (Medio, Montoya, Swartzentruber, Rennie, Ivy, Prioli and McNally) also were not convicted of simple assault against Plaintiff.  (Compl., ¶¶ 135-140.)

Plaintiff further alleges that a ceiling-mounted camera less than ten feet away from the cell where the January 14, 2011 assault took place was purposefully withheld from the criminal trial against the seven ACJF officers.  Plaintiff also alleges that the video footage of his injuries taken by Sgt. Decicco (referenced as V-115 in the investigation reports) was withheld from the trial.  Plaintiff had filed grievances on January 19, 2011 and January 20, 2011, as well as a February 3, 2011 letter sent to Warden Bondiskey asking that the video footage be preserved for trial.  (Compl., ¶¶ 141-145.)

Plaintiff alleges that Lt. Conrad of Internal Affairs had assured Plaintiff that video evidence would be preserved and was the basis for the criminal charges against the seven ACJF officers.  The only video footage turned over to the court for trial was taken from a ceiling-mounted camera about 30 feet from the cell where the alleged attack took place.  (Compl., ¶¶ 146-148.)

Plaintiff seeks an unspecified award of compensatory and punitive damages against Warden Bondiskey, CO Scott Medio, Sgt. Montoya, Sgt. Swartzentruber, CO Rennie, CO Ivy, CO Prioli, CO McNally, and other John Doe defendants (ACJF officers) for their violations of Plaintiff's constitutional rights.  Namely, Plaintiff asserts claims of excessive force, cruel and unusual punishment, deprivation of liberty/denial of due process, retaliation, conspiracy, and denial of access to the courts. (Compl., "Relief Requested" at pp. 24-25.)

## II.  STANDARDS FOR A SUA SPONTE DISMISSAL

The Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, §§ 801-810, 110 Stat. 1321-66 to 1321-77 (April 26, 1996), requires a district court to review a complaint in a civil action in which a prisoner is proceeding in forma pauperis or seeks redress against a governmental employee or entity.  The Court is required to identify cognizable claims and to sua sponte dismiss any claim that is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a

defendant who is immune from such relief.  28 U.S.C. §§ 1915(e)(2)(B) and 1915A.  This action is subject to <u>sua</u> <u>sponte</u> screening for dismissal under both 28 U.S.C. § 1915(e)(2)(B) and § 1915A.

In determining the sufficiency of a pro se complaint, the Court must be mindful to construe it liberally in favor of the plaintiff.  <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 93–94 (2007) (following <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976); <u>see also</u> <u>United States v. Day</u>, 969 F.2d 39, 42 (3d Cir. 1992).

The Supreme Court refined the standard for summary dismissal of a complaint that fails to state a claim in <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009).  The Court examined Rule 8(a)(2) of the Federal Rules of Civil Procedure which provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  <u>Fed.R.Civ.P.</u> 8(a)(2). Citing its opinion in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007) for the proposition that "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 555), the Supreme Court held that, to prevent a summary dismissal, a civil complaint must now allege "sufficient factual matter" to show that the claim is facially plausible.  This then "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203 (3d

11

Cir. 2009)(citing <u>Iqbal</u>, 556 U.S. at 676).  The Supreme Court's
ruling in <u>Iqbal</u> emphasizes that a plaintiff must demonstrate that
the allegations of his complaint are plausible.  <u>See</u> <u>id</u>. at 678-
79; <u>see</u> <u>also</u> <u>Twombly</u>, 505 U.S. at 555, & n. 3; <u>Warren Gen. Hosp.</u>
<u>v. Amgen Inc.</u>, 643 F.3d 77, 84 (3d Cir. 2011).  "A complaint must
do more than allege the plaintiff's entitlement to relief.  A
complaint has to 'show' such an entitlement with its facts."
<u>Fowler</u>, 578 F.3d at 211 (citing <u>Phillips v. County of Allegheny</u>,
515 F.3d 224, 234-35 (3d Cir. 2008).  <u>See</u> <u>also</u> <u>Argueta v. U.S.</u>
<u>Immigration & Customs Enforcement</u>, 643 F.3d 60, 73 (3d Cir.
2011); <u>Bistrian v. Levi</u>, 2012 WL 4335958, *8 (3d Cir. Sept. 24,
2012)(allegations that are no more than conclusions are not
entitled to the assumption of truth; a court should "look for
well-pled factual allegations, assume their veracity, and then
'determine whether they plausibly give rise to an entitlement to
relief.'")(quoting, <u>Iqbal</u>, 556 U.S. at 679).

### III.   <u>SECTION 1983 ACTIONS</u>

Plaintiff brings this action pursuant to 42 U.S.C. § 1983.
Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory ...
> subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall be
> liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress ... .

Thus, to state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994). See also Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

IV.  ANALYSIS

A.  Excessive Force Claim

Plaintiff first asserts an excessive force claim against the seven ACJF officers, CO Scott Medio, Sgt. Montoya, Sgt. Swartzentruber, CO Rennie, CO Ivy, CO Prioli, CO McNally, and other John Doe defendants (ACJF officers). As a pre-trial detainee at the time of the incident, Plaintiff was protected by the Due Process Clause of the Fourteenth Amendment. Fuentes v. Wagner, 206 F.3d 335, 341 (3d Cir. 2000). Analysis of whether a detainee or un-sentenced prisoner has been deprived of liberty without due process is governed by the standards set forth by the Supreme Court in Bell v. Wolfish, 441 U.S. 520 (1979); Fuentes, 206 F.3d at 341-42. In Bell, the Supreme Court stated:

> In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee. For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in

13

accordance with due process of law....

A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees....

Bell, 441 U.S. at 535-39 (citations omitted). The Court further explained that the government has legitimate interests that stem from its need to maintain security and order at the detention facility. "Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial." Id. at 540. Retribution and deterrence, however, are not legitimate nonpunitive governmental objectives. Id. at 539 n. 20. Nor are grossly exaggerated responses to genuine security considerations. Id. at 539 n. 20, 561-62.

Thus, in order for Plaintiff to prove a claim for excessive force, he must demonstrate that the force used amounted to a

14

wanton infliction of punishment, as opposed to restraint
rationally related to exercising control.  <u>Fuentes</u>, 206 F.3d at
342; <u>see</u> <u>also</u> <u>Bell</u>, 441 U.S. at 535.  Further, while correctional
officers may use force against an inmate to preserve order and
maintain the safety of other inmates and staff, they may not use
gratuitous force against an inmate who has been subdued.  <u>See</u>,
<u>e.g.</u>, <u>Giles v. Kearney</u>, 571 F.3d 318, 326 (3d Cir. 2009); <u>Bethune</u>
<u>v. Cnty. of Cape May</u>, Civ. No. 08-5738, 2011 WL 2037627, *3
(D.N.J. May 20, 2011).

Construing all inferences in Plaintiff's favor, as the Court
must do at this preliminary screening stage, this Court
preliminarily finds that Plaintiff has pled facts sufficient to
state a plausible claim for relief necessary to withstand summary
dismissal at this time.  In particular, the facts, as alleged by
Plaintiff in his Complaint, are sufficient to question the use of
force exercised by defendants and the manner and purpose for
which the force was applied.  For instance, Plaintiff alleges
that the defendant officers kicked him and slammed his head into
the wall after he was handcuffed and restrained with shackles.
Therefore, the Court will allow Plaintiff's Fourteenth Amendment
excessive force claim to proceed at this time as against
Defendants, CO Scott Medio, Sgt. Montoya, Sgt. Swartzentruber, CO
Rennie, CO Ivy, CO Prioli, CO McNally, and other John Doe
defendants at ACJF.

B. <u>Conditions of Confinement Claim</u>

Plaintiff next alleges that Defendants' actions constituted cruel and unusual punishment in violation of the Eighth Amendment, or alternatively, a deprivation of liberty interests and due process in violation of his Fourteenth Amendment rights. Because Plaintiff was a pretrial detainee at the relevant time, the Fourteenth Amendment's Due Process Clause governs his claims rather than the Eighth Amendment, which applies to convicted prisoners. <u>Bell v. Wolfish</u>, 441 U.S. 520, 535-37 (1979); <u>Hubbard v. Taylor</u>, 399 F.3d 150, 164 (3d Cir. 2005)("<u>Hubbard I</u>"); <u>Natale v. Camden Cnty. Corr. Facility</u>, 318 F.3d 575, 581 (3d Cir. 2003). As stated above, the Due Process Clause prohibits "punishment" of a pretrial detainee prior to an adjudication of guilt in accordance with due process of law. <u>Bell</u>, 441 U.S. at 535-37; <u>Hubbard I</u>, 399 F.3d at 164-65. To determine whether conditions of confinement amount to "punishment", courts "ask, first, whether any legitimate purposes are served by the[ ] conditions, and second, whether the[ ] conditions are rationally related to these purposes." <u>Hubbard v. Taylor</u>, 538 F.3d 229, 232 (3d Cir. 2008)("<u>Hubbard II</u>")(citing <u>Union Cnty. Jail Inmates v. Di Buono</u>, 713 F.2d 984, 992 (3d Cir. 1983)).

Examining Plaintiff's claim under the second prong (whether these conditions are rationally related to their purpose), the Court must consider whether the conditions caused Plaintiff to "endure such genuine privations and hardship over an extended

period of time," that they became "excessive in relation to the purposes assigned to them." Id. at 233 (citing Union Cnty., 713 F.2d at 992 (in turn quoting Bell, 441 U.S. at 542)(alterations & quotations omitted). While courts ordinarily defer to the expertise of corrections officials in operating jails in a manageable fashion, such deference is not required where substantial evidence in the record shows the conditions to be excessive. Bell, 441 U.S. at 540 n. 23 (citations omitted); Hubbard II, 538 F.3d at 232. The "excessiveness" analysis requires courts to consider the totality of the circumstances, including "the size of the detainee's living space, the length of confinement, the amount of time spent in the confined area each day, and the opportunity for exercise." Hubbard II, 538 F.3d at 233. The Third Circuit's decision in Hubbard II is instructive. There, the court held that requiring pretrial detainees to sleep on mattresses on the floor in cells holding three inmates for between three and seven months did not constitute punishment in violation of the Fourteenth Amendment. 538 F.3d at 234–35. The court stressed that the inmates had access to large day rooms and that the record did not substantiate the plaintiffs' claims that the use of floor mattresses caused disease or led to the splashing of human waste on them. Id. The court concluded that the conditions were not constitutionally excessive given the totality of the circumstances. Id.

17

In this case, Plaintiff's conditions claim appears to encompass two incidents: (1) the time he spent in the holding cell on January 14, 2011, and (2) the time he spent in the detention cell afterwards.  Considering the holding cell conditions, Plaintiff alleges that Defendants kept him chained and shackled in a holding cell for almost 12 hours despite injuries, refused to let Plaintiff use the bathroom, and thereafter allowed Plaintiff to defecate in his clothes in which he remained throughout the night.  While this Court is certainly sympathetic to Plaintiff's humiliation in this regard, the allegations simply do not rise to the level of a constitutional deprivation as contemplated in <u>Hubbard II</u>.  Plaintiff was placed in a holding cell for less than a day, and he alleges no other hardship during this very short period of time.  Therefore, the Court will dismiss this claim without prejudice at this time.

Similarly, Plaintiff was confined in the "cold" detention cell from January 24, 2011 to February 16, 2011, for a total of 24 days.  Plaintiff complains that his cell was cold as the caulking had been removed from the window.[3]  He also complains that he was provided with only one blanket, one sheet and one prison uniform.  However, on January 26, 2011, a nurse ensured that Plaintiff was given a t-shirt and socks.  Plaintiff also

---

[3]  It is not clear from the Complaint whether the caulking had been removed by inmates who had been housed there before Plaintiff.

alleges that he was afraid to eat his food because he was afraid the food was contaminated by the guards.  However, there are no allegations that he was deprived of food and water during this time.  Consequently, this Court finds that these allegations are not sufficient at this time to give rise to a constitutional violation.  Plaintiff makes only a singular allegation of hardship (being placed in a cold cell), and the duration of his detention for 24 days was far less than the time frame that the Third Circuit found not to be excessive in Hubbard II. Therefore, based on the totality of the circumstances as alleged by Plaintiff for the time he spent in detention, this Court concludes that the conditions were not constitutionally excessive, and this claim will be dismissed accordingly for failure to state a claim at this time.

Although confinement for 24 winter days in a poorly insulated, colder cell may not rise to the level of a constitutional claim, such conduct may serve as further evidence of retaliation, discussed in subpart E, below.

C.  Denial of Medical Care Claim

Plaintiff also appears to assert a denial of medical care claim concerning the ACJF nurse's "refusal" to treat Plaintiff for his injuries sustained on January 14, 2011.  Again, since Plaintiff was a pretrial detainee at the time of the alleged injury, the Fourteenth Amendment is applicable.  See City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 243-45

(1983)(holding that the Due Process Clause of the Fourteenth
Amendment, rather than the Eighth Amendment, controls the issue
of whether prison officials must provide medical care to those
confined in jail awaiting trial); Hubbard I, 399 F.3d at 158;
Fuentes, 206 F.3d at 341 n.9 ; Monmouth County
Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 346
n.31 (3d Cir. 1987), cert. denied, 486 U.S. 1006 (1988).  See
also Montgomery v. Ray, 145 Fed. Appx. 738, 740, 2005 WL 1995084
(3d Cir. 2005)(unpubl.)("the proper standard for examining such
claims is the standard set forth in Bell v. Wolfish, ...; i.e.
whether the conditions of confinement (or here, inadequate
medical treatment) amounted to punishment prior to adjudication
of guilt....")(citing Hubbard I, 399 F.3d at 158).  In Hubbard,
the Third Circuit clarified that the Eighth Amendment standard
only acts as a floor for due process inquiries into medical and
non-medical conditions of pretrial detainees.  399 F.3d at 165-
67.

In this action, Plaintiff alleges that a nurse came with
Sgt. Decicco, who videotaped Plaintiff's injuries, to "look" at
his injuries, but otherwise provided no treatment to Plaintiff at
that time, while he was in the holding cell.  Plaintiff does not
allege that he was denied medical treatment at any other time,
and he admits that he was treated for his staph infection on
January 16, 2011.  Therefore, these allegations, without more, do
not show that Plaintiff was denied medical treatment sufficient

to state a Fourteenth Amendment violation.  Accordingly, this claim will be dismissed without prejudice at this time as against all named Defendants.

D.  Strip Search Claim

The Fourth Amendment to the United States Constitution, made applicable to the states through the Due Process Clause of the Fourteenth Amendment, provides that "The right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated."  First addressing the constitutionality of strip searches of pre-trial detainees in Bell v. Wolfish, 441 U.S. 520 (1979), the Supreme Court upheld a policy requiring pre-trial detainees in any correctional facility run by the Federal Bureau of Prisons "to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution."  441 U.S. at 558.

Recognizing that "deterring the possession of contraband depends in part on the ability to conduct searches without predictable exceptions," Florence v. Board of Chosen Freeholders of the County of Burlington, 132 S.Ct. 1510, 1516 (2012), the Supreme Court in Hudson v. Palmer, 468 U.S. 517 (1984), upheld random searches of inmate lockers and cells even without reason to suspect a particular individual of concealing a prohibited item.

21

More recently, in <u>Florence v. Board of Chosen Freeholders of the County of Burlington</u>, 132 S.Ct. 1510 (2012), the Supreme Court considered the constitutionality of strip searches conducted by county jails as part of the standard intake process, even of persons arrested for minor offenses.  The searches at issue required new detainees, who would be admitted to the general population, to disrobe in front of correctional officers, who would check for body markings and contraband, including a visual inspection of body openings.  The searches did not involve any touching by correctional officers.

Referring to the long-standing principle that a regulation impinging on an inmate's constitutional rights will be upheld "'if it is reasonably related to legitimate penological interests,'" <u>id</u>. at 1515–16 (quoting <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987), the Court noted that "[m]aintaining safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face."  132 S.Ct. at 1515.  Thus, where institutional security is involved, "deference must be given to the officials in charge of the jail unless there is substantial evidence demonstrating their response to the situation is exaggerated."  <u>Id</u>. at 1518 (citation and internal quotation marks omitted).

Here, however, Plaintiff alleges that two times each day while he was in detention, he was strip searched, namely, he was

told to strip naked and was subjected to a visual body cavity
search. Plaintiff further alleges that the officers would laugh
at Plaintiff during the strip search and that these searches were
conducted even though Plaintiff never left his detention cell and
thus had no opportunity to obtain contraband from others, let
alone to secrete it in his body. These allegations, if true, may
suggest that Plaintiff was subjected to numerous strip searches
so outside the scope of any reasonable search policy that it
would rise to the level of a Fourth Amendment violation.
Accordingly, the Court will allow this limited claim to proceed
at this time.[4]

E. Retaliation Claim

Next, Plaintiff alleges that Defendants have violated his
First Amendment right to seek redress for grievances by their
acts of retaliation against him. "Retaliation for the exercise
of constitutionally protected rights is itself a violation of
rights secured by the Constitution ... ." White v. Napoleon, 897
F.2d 103, 111-12 (3d Cir. 1990); see also Bistrian, 2012 WL
4335958 at *18; Mitchell v. Horn, 318 F.3d 523, 529-31 (3d Cir.
2003); Rauser v. Horn, 241 F.3d 330, 333-34 (3d Cir. 2001); Allah
v. Seiverling, 229 F.3d 220, 224-26 (3 Cir. 2000). To prevail on

---

[4] The Court notes that Plaintiff has not named the ACJF
correctional officers who conducted these strip searches,
however, he does add John Doe ACJF officers as defendants in this
action, who presumably were the officers who conducted these
searches. Plaintiff may amend his Complaint to name these
Defendants once he has discovered their identities.

a retaliation claim, Plaintiff must demonstrate that (1) he engaged in constitutionally-protected activity; (2) he suffered, at the hands of a state actor, adverse action "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights;" and (3) the protected activity was a substantial or motivating factor in the state actor's decision to take adverse action.  Rauser, 241 F.3d at 333 (3d Cir. 2001)(quoting Allah, 229 F.3d at 225).

The plausibility of Plaintiff's allegation as to the first factor can not be disputed as Plaintiff has engaged in the filing of grievances and criminal complaints against the ACJF officers in state court, as well as this present action.  Moreover, Plaintiff alleges facts that may be sufficient to create a plausible inference that he has in fact been the subject of a concerted retaliatory effort, namely, the threats of harm, calling Plaintiff a snitch in front of other inmates, placement in a cold cell, and constant strip searches.  Finally, the proximity of these alleged retaliatory acts with Plaintiff's filing of grievances and criminal charges against the ACJF officers may suggest that Plaintiff's filing of grievances and criminal charges was the "substantial or motivating factor" in the Defendants' decision to retaliate against Plaintiff.  Rauser, 241 F.3d at 333 (3d Cir. 2001)(quoting Allah, 229 F.3d at 225); see also Bistrian, 2012 WL 4335958 at *19.  But see Dunbar v. Barone, 487 Fed. Appx. 721, 723 (3d Cir. July 10, 2012).

Therefore, the Court will allow Plaintiff's retaliation claim to proceed at this time.

F.  Denial of Access to the Courts Claim

Plaintiff also appears to allege that Defendants denied him access to the courts by withholding video-tape evidence from the criminal trial against the Defendant ACJF officers for assault, which resulted in the dismissal of the charges against these officers.

The Constitution guarantees inmates a right of access to the courts.  See Lewis v. Casey, 518 U.S. 343, 346 (1996).  The Supreme Court has repeatedly recognized that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." Lewis, 518 U.S. at 346 (quoting Bounds v. Smith, 430 U.S. 817, 828 (1977)(internal quotations omitted)).  This right is not, however, unlimited.  Inmates may only proceed on access-to-court claims with respect to (1) challenges to their sentences (direct or collateral), (2) conditions-of-confinement cases, and (3) pending criminal charges.  See Lewis, 518 U.S. at 354-55 (recognizing inmates' right to access courts "to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement"); Hargis v. Atl. Cnty. Justice Facility, Civ. No. 10-1006, 2010 WL 1999303, *6

25

(D.N.J. May 18, 2010)(recognizing inmate's additional right to access courts "with respect to legal assistance and participation in one's own defense against pending criminal charges")(citing May v. Sheahan, 226 F.3d 876, 883-84 (7th Cir. 2000) and Caldwell v. Hall, Civ. No. 97-8069, 2000 WL 343229 (E.D.Pa. Mar.31, 2000)).  Additionally, an inmate must show that the lack of meaningful access to the courts caused him past or imminent "actual injury".  See Lewis, 518 U .S. at 350-52; Oliver v. Fauver, 118 F.3d 175, 177-78 (3d Cir.1997); Hargis, 2010 WL 1999303, *6.  To do this, he must identify an "arguable," "nonfrivolous" underlying cause of action, either anticipated or lost, and show that the prison's deficient program frustrated his efforts to litigate that action.  Lewis, at 351-53; Christopher v. Harbury, 536 U.S. 403, 415 (2002)(citing Lewis, 518 U.S. at 353 & n. 3)).  To satisfy the "actual injury" requirement,

> [An inmate] might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known.  Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable to file even a complaint.

Lewis, 518 U.S. at 351. Conclusory allegations that an inmate suffered prejudice will not support an access-to-courts claim. Arce v. Walker, 58 F. Supp.2d 39, 44 (W.D.N.Y. 1999)(internal citations omitted).

Here, Plaintiff's access to courts claim involves his criminal charges against the ACJF officers.  Plaintiff is

26

alleging that the withholding of the video evidence resulted in the dismissal of these criminal charges.[5]  However, as noted above, Plaintiff's constitutional claim under § 1983 for denial of access to the courts may only proceed if the interference relates to Plaintiff's challenges to his criminal sentences (direct or collateral), a conditions-of-confinement claim, and/or pending criminal charges.  See Lewis, 518 U.S. at 354–55.  In this case, Plaintiff is complaining that the video evidence was

_____

    [5]  The Third Circuit has held that a denial of access claim is available where the state officials "wrongfully and intentionally conceal information crucial to a person's ability to obtain redress through the courts, and do so for the purpose of frustrating that right, and that concealment, and the delay engendered by it substantially reduce the likelihood of one's obtaining the relief to which one is otherwise entitled."  Gibson v. Superintendent of N.J. Dep't of Law and Pub. Safety, 411 F.3d 427, 445 (3d Cir. 2005) overruled in part on other grounds as noted in Dique v. N.J. State Police, 603 F.3d 181 (3d Cir. 2010) (citing Estate of Smith v. Marasco, 318 F.3d 497, 511 (3d Cir. 2003))(quoting Swekel v. City of River Rouge, 119 F.3d 1259, 1262–63 (6th Cir. 1997)).  In Gibson, the inmate plaintiff alleged that state police officers and other government officials had wrongfully and intentionally concealed exculpatory material concerning racial profiling by the state police department, the surfacing of which, led to the reversal of the plaintiff's conviction.  Gibson, 411 F.3d at 445.  Specifically, in Gibson the plaintiff alleged that the actions of the attorney general defendants "obfuscated the real extent of racial profiling" by intentionally withholding and suppressing a racial profiling report, which denied him the opportunity to obtain his release for several years.  Id. The Third Circuit held that although the attorney general defendants' actions had the unfortunate result of perpetuating his incarceration for several years, the plaintiff had alleged no facts to show that the actions of attorney general defendants were directed at denying relief "to people like the plaintiff".  Id. at 446–47.  See also Burkett v. Newman, 2012 WL 1038914, *3-4 (W.D.Pa. Feb. 21, 2012). Nevertheless, as stated in the text above, because the evidence Plaintiff claims was withheld did not involve either a habeas proceeding, direct appeal, his own criminal proceeding, or a conditions of confinement claim, this claim is not actionable.

withheld from the criminal trial of other individuals than
Plaintiff.  Moreover, even if Plaintiff is asserting that the
video evidence was withheld at his own criminal trial stemming
from the January 14, 2011 incident, Plaintiff admits that he was
acquitted of the charges.

Consequently, Plaintiff shows no actual injury, and has not
stated a cognizable claim for relief.  Therefore, this claim will
be dismissed without prejudice for failure to state a claim.

G.   Procedural Due Process Claim

Plaintiff's next claim appears to assert that his procedural
due process rights were violated when the disciplinary hearing
officer did not permit him to call witnesses or use videotape
evidence at his disciplinary hearing.  A prisoner facing the loss
of a legally cognizable liberty interest following disciplinary
proceedings has a due process right to certain procedural
protections, including the opportunity to call witnesses and
present documentary evidence.  Wolff v. McDonnell, 418 U.S. 539,
566-67 (1974).  But this due process right is not triggered
unless the prison "imposes atypical and significant hardship on
the inmate in relation to the ordinary incidents of prison life."
Sandin v. Conner, 515 U.S. 472, 484 (1995).  Petitioner was
placed in disciplinary custody for about 24 days only (he was
sanctioned with 30 days, but only remained in detention for about
24 days) a result of his alleged disciplinary conduct.  As this
Court discussed above, Petitioner does not present any evidence

28

that the conditions he faced in disciplinary custody amounted to

an "atypical and significant hardship" under <u>Sandin</u>, and the

United States Court of Appeals for the Third Circuit has held

that this type of confinement does not constitute an "atypical

and significant hardship."  <u>See</u> <u>Griffin v. Vaughn</u>, 112 F.3d 703,

705-07 (3d Cir. 1997)(ruling that fifteen months in segregation

was not an atypical and significant hardship); <u>Smith v.</u>

<u>Mensinger</u>, 293 F.3d 641, 654 (3d Cir. 2002) (holding that seven

months in disciplinary confinement did not implicate a protected

liberty interest).  Because Petitioner fails to establish a

protected liberty interest, his due process claim necessarily

fails.  <u>See</u> <u>Dunbar</u>, 487 Fed. Appx. at 724-25.

Therefore, this purported disciplinary due process claim will be

dismissed for failure to state a claim.

H.  <u>Conspiracy Claim</u>

     Plaintiff also asserts a general conspiracy claim ostensibly

under 42 U.S.C. §§ 1985(3).  The elements of a § 1985(3) claim

are "(1) a conspiracy; (2) for the purpose of depriving, either

directly or indirectly, any person or class of persons of the

equal protection of the laws, or of equal privileges and

immunities under the laws; and (3) an act in furtherance of the

conspiracy; (4) whereby a person is injured in his person or

property or deprived of any right or privilege of a citizen of

the United States."  <u>Farber v. City of Paterson</u>, 440 F.3d 131,

134 (3d Cir. 2006)(internal quotations and citations omitted).

State law civil conspiracy has similar requirements.  LoBiondo v. Schwartz, 970 A.2d 1007, 1029–30 (N.J. 2009)(noting that the elements include an agreement between the parties to inflict a wrong against or an injury upon another, and an overt act that results in damage).

In this case, Plaintiff does not allege his conspiracy claim with any specificity.  Rather, he makes only general, conclusory and unsupported statements.  Plaintiff also does not provide any factual support for a conspiracy under § 1985 as "the reach of section 1985(3) is limited to private conspiracies predicated on 'racial, or perhaps otherwise class based, invidiously discriminatory animus.'"  Lake v. Arnold, 112 F.3d 682, 685 (3d Cir. 1997)(quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)).  See also Reddish v. Burlington Tp. Police Dept., 2013 WL 144258, *3 (D.N.J. Jan. 11, 2013).  Here, because Plaintiff fails to make anything other than conclusory allegations with regard to his general § 1985 conspiracy claim, any such conspiracy claim must be dismissed without prejudice at this time.

I.  Supervisor Liability

Finally, Plaintiff brings this action against the ACJF Warden Bondiskey asserting a claim that appears to be based on a theory of supervisor liability.  As a general rule, government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior.  See

30

Iqbal, 556 U.S. at 676; Monell v. New York City Dept. of Social
Servs., 436 U.S. 658, 691 (1978)(finding no vicarious liability
for a municipal "person" under 42 U.S.C. § 1983); Robertson v.
Sichel, 127 U.S. 507, 515-16 (1888) ("A public officer or agent
is not responsible for the misfeasances or position wrongs, or
for the nonfeasances, or negligences, or omissions of duty, of
subagents or servants or other persons properly employed by or
under him, in discharge of his official duties").  In Iqbal, the
Supreme Court held that "[b]ecause vicarious [or supervisor]
liability is inapplicable to Bivens[6] and § 1983 suits, a
plaintiff must plead that each Government-official defendant,
through the official's own individual actions, has violated the
Constitution."  Iqbal, 556 U.S. at 676.  Thus, each government
official is liable only for his or her own conduct.  The Court
rejected the contention that supervisor liability can be imposed
where the official had only "knowledge" or "acquiesced" in their
subordinates conduct.  Id., 556 U.S. at 677.

Under pre-Iqbal Third Circuit precedent, "[t]here are two
theories of supervisory liability," one under which supervisors
can be liable if they "established and maintained a policy,
practice or custom which directly caused [the] constitutional
harm," and another under which they can be liable if they
"participated in violating plaintiff's rights, directed others to

_____

        [6]  Bivens v. Six Unknown Named Agents of Federal Bureau of
Narcotics, 403 U.S. 388 (1971)

violate them, or, as the person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations." Santiago v. Warminster Twp., 629 F.3d 121, 127 n. 5 (3d Cir. 2010)(internal quotation marks omitted).  "Particularly after Iqbal, the connection between the supervisor's directions and the constitutional deprivation must be sufficient to demonstrate a plausible nexus or affirmative link between the directions and the specific deprivation of constitutional rights at issue." Id. at 130.

The Third Circuit has recognized the potential effect that Iqbal might have in altering the standard for supervisory liability in a § 1983 suit but, to date, has declined to decide whether Iqbal requires narrowing of the scope of the test.  See Santiago, 629 F.3d 130 n. 8; Bayer v. Monroe County Children and Youth Servs., 577 F.3d 186, 190 n. 5 (3d Cir. 2009)(stating in light of Iqbal, it is uncertain whether proof of personal knowledge, with nothing more, provides sufficient basis to impose liability upon supervisory official).  Hence, it appears that, under a supervisory theory of liability, and even in light of Iqbal, personal involvement by a defendant remains the touchstone for establishing liability for the violation of a plaintiff's constitutional right.  Williams v. Lackawanna County Prison, 2010 WL 1491132, at *5 (M.D.Pa. Apr. 13, 2010).

Facts showing personal involvement of the defendant must be asserted; such assertions may be made through allegations of

specific facts showing that a defendant expressly directed the deprivation of a plaintiff's constitutional rights or created such policies where the subordinates had no discretion in applying the policies in a fashion other than the one which actually produced the alleged deprivation; e.g., supervisory liability may attach if the plaintiff asserts facts showing that the supervisor's actions were "the moving force" behind the harm suffered by the plaintiff.  See Sample v. Diecks, 885 F.2d 1099, 1117–18 (3d Cir. 1989); see also Iqbal, 556 U.S. at 676-686.

Here, Plaintiff provides no facts describing how the supervisory defendant, Warden Bondiskey actively or affirmatively violated his constitutional rights, i.e., he fails to allege facts to show that Bondiskey expressly directed the deprivation of his constitutional rights, or that Bondiskey created policies which left subordinates with no discretion other than to apply them in a fashion which actually produced the alleged deprivation.  At best, it would appear that Plaintiff is alleging that Bondiskey became aware of the January 14, 2011 incident and later misconduct by the seven ACJF officers, CO Scott Medio, Sgt. Montoya, Sgt. Swartzentruber, CO Rennie, CO Ivy, CO Prioli, CO McNally, and other John Doe defendants (ACJF officers), via Plaintiff's grievance filings.  However, participation in the after-the-fact review of a grievance or appeal is insufficient to establish personal involvement on the part of those individuals reviewing grievances.  See Rode v. Dellarciprete, 845 F.2d 1195,

1208 (3d Cir. 1988)(finding the receipt of a grievance insufficient to show the actual knowledge necessary for personal involvement); <u>Brooks v. Beard</u>, 167 Fed. Appx. 923, 925 (3d Cir. 2006)(per curiam)(allegations of inappropriate response to grievances does not establish personal involvement required to establish supervisory liability).

In sum then, Plaintiff has alleged no facts to support personal involvement by Bondiskey, and simply relies on recitations of legal conclusions such that Bondiskey failed to supervise, oversee or correct the alleged misconduct by the named ACJF correctional officer defendants after he allegedly received Plaintiff's grievances. These bare allegations, "because they are no more than conclusions, are not entitled to the assumption of truth." <u>Iqbal</u>, 556 U.S. at 679. Accordingly, this Court will dismiss without prejudice the Complaint, in its entirety, as against the Defendant Warden Bondiskey, because it is based on a claim of supervisor liability, which is not cognizable in this § 1983 action, pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

Nevertheless, if Plaintiff believes that he can assert facts to show more than supervisor liability, that is, Warden Bondiskey's personal knowledge and acquiescence in the constitutional deprivations beyond simply learning of them in

34

Plaintiff's grievances, then he may move to file an amended

complaint accordingly.[7]


J.  <u>Appointment of Counsel</u>

On or about October 9, 2012, Plaintiff filed an application

for appointment of counsel in this matter.  (Docket entry no. 2).

Indigent persons raising civil rights claims have no absolute

constitutional right to counsel.  <u>Parham v. Johnson</u>, 126 F.3d

454, 456-57 (3d Cir. 1997).  In determining whether to appoint

counsel, a court should consider several factors:

> As a preliminary matter, the plaintiff's claim must
> have some merit in fact and law. ... If the district
> court determines that the plaintiff's claim has some
> merit, then the district court should consider the
> following factors:
>
>     (1) the plaintiff's ability to present his or her
> own case;
>     (2) the complexity of the legal issues;
>     (3) the degree to which factual investigation will
> be necessary and the ability of the plaintiff to pursue
> such investigation;
>     (4) the amount a case is likely to turn on
> credibility determinations;
>     (5) whether the case will require the testimony of
> expert witnesses;

---

[7]  Plaintiff should note that when an amended complaint is
filed, the original complaint no longer performs any function in
the case and "cannot be utilized to cure defects in the amended
[complaint], unless the relevant portion is specifically
incorporated in the new [complaint]."  6 Wright, Miller & Kane,
<u>Federal Practice and Procedure</u> § 1476 (2d ed.1990)(footnotes
omitted).  An amended complaint may adopt some or all of the
allegations in the original complaint, but the identification of
the particular allegations to be adopted must be clear and
explicit.  <u>Id</u>.  To avoid confusion, the safer course is to file
an amended complaint that is complete in itself.  <u>Id</u>.

(6) whether the plaintiff can attain and afford counsel on his own behalf.

[Tabron v. Grace, 6 F.3d 147, 155-56, 157 n.5 (3d Cir. 1993), cert. denied, 510 U.S. 1196 (1994).]  This list of factors is not exhaustive, but instead should serve as a guide post for the district courts.

Correspondingly, courts should exercise care in appointing counsel because volunteer lawyer time is a precious commodity and should not be wasted on frivolous cases.  Id. at 157.

Parham, 126 F.3d at 457-58.

Applying these factors to this case, the Court is not inclined to allow appointment of counsel at this time. Plaintiff's claims in his Complaint do not involve complex issues of law or fact, and it is unlikely that there will be a need for extensive investigation and discovery for Plaintiff to prepare and present his case for trial.  Plaintiff also appears to be articulate and demonstrates an understanding of the legal issues and ability to prepare documents and present his case coherently. Finally, expert testimony is not essential to Plaintiff's ability to present his case.  It is too early to determine whether Plaintiff's case will rest on determinations of credibility that would support appointment of counsel.  Thus, the only factor weighing in favor of appointment of counsel is Plaintiff's indigency.  Given the balance of factors against appointment of counsel at this time, the Court will deny Plaintiff's application for appointment of counsel without prejudice to him renewing such application at a later time if the circumstance in this case so warrant.

36

V.   <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff's claims asserting unconstitutional conditions of confinement, denial of medical care, denial of access to the courts, denial of procedural due process, and conspiracy, will be dismissed without prejudice, in their entirety, as against all named Defendants, pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1). Further, the Complaint shall be dismissed without prejudice, in its entirety, against Defendant Warden Bondiskey, pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1), because it is impermissibly based on a claim of supervisor liability.  However, Plaintiff's remaining claims asserting use of excessive force, unlawful strip searches and retaliation, may proceed at this time as against the remaining Defendants, ACJF officers, CO Scott Medio, Sgt. Montoya, Sgt. Swartzentruber, CO Rennie, CO Ivy, CO Prioli, CO McNally, and other John Doe defendants (ACJF officers).  Finally, Plaintiff's application for appointment of counsel (Docket entry no. 2) will be denied without prejudice at this time.  An appropriate order follows.


 **s/ Jerome B. Simandle**
JEROME B. SIMANDLE, Chief Judge
United States District Court

Dated: **March 18, 2013**

37